IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| STANLEY B. SMITH, JR., | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 07-1641 (JBS/JS) |
| v. | : |  |
| GARY MERLINE, et al., | : | **OPINION** |
| Defendants. | : |  |

APPEARANCES:

Bruce M. Gorman, Jr., Esq.
Jonathan M. Korn, Esq.
BLANK ROME, LLP
301 Carnegie Center
3rd Floor
Princeton, NJ 08540
    Counsel for Plaintiff Stanley B. Smith, Jr.

James T. Dugan, Esq.
ATLANTIC COUNTY DEPARTMENT OF LAW
1333 Atlantic Avenue
8th Floor
Atlantic City, NJ 08401
    Counsel for Defendants Gary Merline, Geraldine Cohen,
    Michael Kelly and Diana Bader

Debra Tatum Kuser, Esq.
Thomas J. Decker, Esq.
DECKER & MAGAW
507 Westfield Avenue
Westfield, NJ 07090
    Counsel for Defendants CFG Medical Company LLC, James Neal
    and Jerry Connors

**SIMANDLE**, District Judge:

    This matter is presently before the Court on three motions

for summary judgment on a claim arising out of Plaintiff Stanley

B. Smith, Jr.'s treatment while a pretrial detainee at Gerard L.

Gormley Justice Facility ("GGJF").  Defendants Gary Merline, the
Division Director of GGJF, Captain Geraldine Cohen, Sergeant
Michael Kelly, and Diana Bader (collectively, "Prison
Defendants"), ask for summary judgment on the grounds that
Plaintiff did not exhaust his administrative remedies [Docket
Item 73].  Defendants CFG Medical Company LLC, Dr. James Neal,
and Nurse Jerry Connors (collectively, "CFG Defendants")
similarly seek summary judgment for failure to exhaust, but CFG
Medical Company also seeks summary judgment on the issue of
municipal liability [Docket Item 77].  Finally, Plaintiff has
filed a cross motion for partial summary judgment, arguing there
is no genuine dispute that he has serious medical needs that
require adequate medical treatment under the Fourteenth Amendment
[Docket Item 81].  For the reasons expressed below, the Court
will deny the Prison Defendants' motion for summary judgment,
grant in part and deny in part the CFG Defendants' motion for
summary judgment, and grant in part and deny in part Plaintiff's
motion for partial summary judgment.

## I.    FACTS AND PROCEDURAL HISTORY

These motions, with the exception of Defendant CFG's request
for summary judgment due to the absence of municipal liability,
do not involve Plaintiff's alleged mistreatment while at GGJF.
Consequently, in summarizing the facts, the Court will focus on
evidence of CFG's liability, taking Plaintiff's evidence to be

true and construing that evidence in favor of Plaintiff to the extent Plaintiff is the non-moving party.

### A.   Alleged Mistreatment

It is undisputed that at all times relevant to this action, Plaintiff suffered from end-stage renal failure, "a serious medical condition whereby the kidneys cease to function well enough to maintain homeostasis," and congestive heart failure, "a serious medical condition in which excess fluid is in the lungs, causing difficulty with oxygen delivery to the blood stream." (Iannuzzelli Report at 1, 2, Korn Decl. Exh. G; Neal Dep. at 34-39, 39-40, Korn Decl. Exh. I.)  For these conditions he receives dialysis.  (Pl. Dep. at 29-32, Def. CFG Exh. A.)  In addition, he may have had a condition called calciphylaxis, a complication of renal failure that "involves deposition of calcium in small vasculature, ultimately leading to obstruction of the vessel." (Iannuzzelli Report at 2, Korn Decl. Exh. G; Neal Dep. at 34-39, 39-40, Korn Decl. Exh. I.)  There is no evidence in the record that Plaintiff was ever diagnosed with this condition.

On August 3, 2006, Plaintiff was incarcerated as a pretrial detainee at GGJF, where he remained for approximately one year, until he was sentenced and transferred to South Woods State Prison.  For almost all of his time at GGJF, Plaintiff was housed in the medical unit, where he was the "tier representative" and spoke on behalf of himself and the other prisoners in the medical

unit.  (Pl. Dep. at 48, Def. CFG Exh. A.)  In February and March

2007, Plaintiff wrote four letters to prison officials

complaining about CFG staff interfering in prison disciplinary

matters.  (Gorman Decl. Exhs. L-1, M-1, & N-1.)  As a result of

Plaintiff's complaints, on or about February 26, 2007, Captain

James Murphy instructed CFG staff not to intervene.  (Korn Decl.

Exh. A.)  According to Plaintiff, however, the CFG staff

continued to interfere in prison matters.  (Gorman Decl. Exhs. M-

1 & N-1.)

Plaintiff asserts that Nurse Conners retaliated against him

by reporting to prison officials that Plaintiff's sister, then a

prison guard at a neighboring facility, was impermissibly

"fraternizing" with her brother.  As evidence of this, Plaintiff

offers Conners' own statement to Captain Cohen that the exchanges

between Plaintiff and his sister made Plaintiff "even more

arrogant and belligerent."  (Korn Decl. Exh. B.)  On a subsequent

investigation, Nurse Conners modified her story, stating that

Plaintiff spoke to his sister only two days a week (rather than

"practically every day") and clarified that she had never heard

any of their conversations.  (Korn Decl. Exh. C.)

On March 14, 2007, Nurse Conners claimed to feel threatened

by a letter Plaintiff had written almost two weeks earlier and in

response GGJF officials transferred Plaintiff to the high

security unit.  (Pl. Dep. at 63, 82-85, 119-20, 127-28, Def. CFG

4

Exh. A.)  Although Plaintiff was exonerated at a hearing three days later, he remained in the high security unit for approximately three more weeks, when he was transferred back to the medical unit.  (Id. at 84.)  While in the high security unit there were no medical staff members monitoring Plaintiff.  (Id. at 54, 74.)  When his blood pressure plummeted, staff would send him back to his cell with water to drink, instead of sending him to the emergency room as would have occurred before the allegedly threatening letter.  (Id. at 67-69, 150-51.)

On March 12, March 19, and April 9, 2007, Plaintiff's dialysis doctors wrote three different requests that Plaintiff be sent to a dermatologist "as soon as possible" to "rule out calliphylaxis," because Plaintiff had calcium deposits on his hands.  (Korn Decl. Exh. E.)  On April 17, 2007, Defendant Neal indicated that these requests would be denied because they were "elective" or "cosmetic."  (Korn Decl. Exh. F.)

After being returned to the medical unit, Plaintiff was moved back and forth between different cells in the unit without any reason.[1]  (Pl. Dep. at 55-56, Def. CFG Exh. A.)

_____

[1] It is unclear from the evidence in the record who was responsible for the moves.  In Plaintiff's opposition to Defendant CFG's motion for summary judgment, Plaintiff's counsel asserts that CFG personnel were responsible for the moves.  (Pl. Opp'n at 15.)  During his deposition, Plaintiff blames Defendants Cohen, Kelly and Merline, but remains unsure what role these individuals played in the moves.  (Pl. Dep. at 55-57, Def. CFG Exh. A.)

**B.    Administrative Review Process**

Plaintiff has offered evidence that GGFJ had two alternative, but equally acceptable, means of making requests and expressing grievances.  GGFJ has a formal review process that is described in the Inmate Handbook.  (Gorman Decl. Exh. A at II-1.)  Through that process inmates must first make an informal grievance by completing an inmate request form and that grievance is to be presented through the chain of command.  (Id.)  If the informal process does not resolve the problem, inmates may submit a formal grievance, using a grievance form, to the Director.  (Id.)  Inmates must file their grievance within ten days of the incident and the Director has fifteen "working days" from the date of receipt in which to respond.  (Id. at II-1 to -2.)  Certain matters, however, "are not grievable issues."  (Id. at II-1.)  Those are: "1. Matters out of the facilities control (Probation, parole, Sentences); 2. Disciplinary matters taken against the grieving inmate or any other inmates; 3. Housing assignments and classification status."  (Id.)

Plaintiff was aware of this process and used inmate request forms to ask for things that he needed.  (Pl. Dep. at 43-47, Def. CFG Exh. A.)  He used the forms to ask for information about Rule 11 of the Federal Rules of Criminal Procedure, plea bargains, ineffective assistance of counsel, and substance abuse treatment.  (Id. at 45-46.)  He asked for clean sheets and case law.  (Id. at

6

45-47.)

Plaintiff used, and GGJF staff apparently accepted, an
alternative route for making grievances.  (Gorman Decl. Exhs. F-1
to N-2.)  From September 2006 until he was transferred to high
security on March 14, 2007, Plaintiff submitted at least nine
handwritten grievances to GGJF staff (generally to Director
Merline), all of which the GGJF staff (often Director Merline
himself) addressed on the merits.  (Id.)  Plaintiff used these
handwritten grievances to express concerns about receiving his
medication at proper intervals, (Exhs. F-1 and H-1)), service of
his meals during Ramadan, (Exh. G-1), access to newspapers, (Exh.
I-1), prison safety, (Exhs. J-1 and K-1), medical staff
interference with prison discipline, (Exhs. L-1 and M-1), and
problems with laundry, (Exh. N-1).  Each of these letters
received a response, usually from Defendant Merline.  (Gorman
Decl. Exhs. F-2, G-2, H-2, I-2, J-2, K-2, L-2, M-2, N-2.)
Plaintiff states that prison officials never refused to address
his handwritten grievances "on the grounds that [he] had failed
to comply with the grievance procedure in the Inmate Handbook"
nor did they require him to resubmit his grievances using the
forms provided in the handbook.  (Pl. Decl. ¶ 4.)

On March 22, 2007, Plaintiff wrote the following grievance
to Defendant Merline:

> Dear Warden Gary, I no longer will direct any
> letter to under staff because of the incident with

7

> Captain Murphy where he misinterpreted a little
> [letter] I forwarded to Captain Cohen.  I believe
> it was done purposefully, and as a result I've been
> placed in extremely unsafe areas due to my medical
> condition.  It's extremely dirty.  The toilets
> overflowed several times already being disinfected.
> In the event that either of the two ports [in] my
> arm pop there[']s no way any one would know what's
> happening, nor will medical be able to get to me in
> time to secure my injury.  It takes 4 minutes to
> bleed to <u>death</u> in the event that either of the two
> open.  There's so much noise over here that in the
> event you knock, the officer[s] totally ignor[e]
> you because there[']s a guy here that bangs all day
> all night.  I had a drop with my blood pressure
> again, and it took medical a great deal of time to
> see me, more than 4 <u>minutes</u> had it been my ports
> I'd be dead now.  In addition, my doctor has sent
> several scripts with me from dialysis one was
> received weeks ago yet I still haven't seen any of
> the scripts filled.  Maybe your assistance on this
> matter can get the ball rolling.

(Gorman Decl. Exh. B.)  Plaintiff reiterated these complaints in

a letter to "Internal Affairs" on April 1, 2007.  (Gorman Decl.

Exh. C.)

### C.  Civil Suit

On April 9, 2007, Plaintiff, proceeding <u>pro se</u>, brought

suit.  After the Court appointed <u>pro bono</u> counsel, Plaintiff

submitted the amended complaint at issue here.  In that

complaint, Plaintiff asserts three causes of action.  In Count I,

Plaintiff alleges that all Defendants were deliberately

indifferent to his serious medical needs in violation of the

Fourteenth Amendment.[2]  In Count II, Plaintiff alleges that

---

[2] Plaintiff asserts that this deliberate indifference
similarly violates his Eighth Amendment rights.  It is

Defendants retaliated against Plaintiff for his filing of grievances by (a) transferring him to solitary confinement (later referred to as high security); (b) refusing to provide adequate medical care; (c) frequently transferring Plaintiff in and out of quarantine for the sole purpose of harassing him; and (d) impugning Plaintiff's character and the character of his sister, forcing his sister to resign from her position as a guard at a nearby state prison. Count III is a negligence claim against Defendants Neal and CFG only, based on Neal's refusal to permit Plaintiff to go to a dermatologist regarding the calcium deposits on his hands. Plaintiff has since consented to the dismissal of Count III [Docket Item 65].

## II.  DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the

---

undisputed, however, that Plaintiff was not yet convicted during his time at GGJF, so that the Eighth Amendment would not apply. See Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005) (holding that the Eighth Amendment is not applicable in cases involving pretrial detainees because the detainees "are not yet at a stage of the criminal process where they can be punished because they have not as yet been convicted of anything"). The relationship between the Fourteenth and Eighth Amendments will be discussed briefly below, but Plaintiff cannot state an independent claim under the Eighth Amendment.

evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. <u>Id</u>.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id</u>.

"[T]he nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." <u>U.S. v. Premises Known as 717 S. Woodward Street, Allentown, Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

<u>Celotex</u>, 477 U.S. at 323.

## B.   Administrative Exhaustion

Defendants, through their two motions for summary judgment, argue that Plaintiff has not exhausted his administrative

remedies, as required by the Prison Litigation Reform Act ("PLRA"), because he did not submit an inmate request form or a grievance form raising the issues presented in this lawsuit. Plaintiff responds that he has satisfied the PLRA by submitting a handwritten grievance through a grievance process recognized by the GGJF.  Defendants offer no reply to this argument.  The Court finds that there is a genuine dispute as to whether Plaintiff has exhausted his administrative remedies and the Court will deny Defendants' motions on this ground.

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "As the statutory language makes clear, § 1997e(a) applies equally to § 1983 actions and to <u>Bivens</u> actions."  <u>Nyhuis v. Reno</u>, 204 F.3d 65, 68 (3d Cir. 2000).  The PLRA's exhaustion requirement applies to all inmate suits "about prison life, whether they involve general circumstances or particular episodes, whether they allege excessive force or some other wrong."  <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002).  Under the Act, the exhaustion of all administrative remedies is mandatory, whether or not the inmate believes that such administrative remedies would be effective and even if the

available administrative remedy process cannot grant the desired remedy.  Booth v. Churner, 532 U.S. 731, 739-41 (2001). Enforcement of the PLRA's exhaustion requirement serves the twin goals of "protect[ing] administrative agency authority . . . . [and] promot[ing] efficiency."  Woodford v. Ngo, 548 U.S. 81, 88 (2006).  The PLRA's exhaustion requirement furthers these goals by providing the "prisoner who does not want to participate in the prison grievance system" with the "incentive to comply with the system's procedural rules."  Id. at 2388.

        As the Court of Appeals has recognized, because there "is no express federal law describing the procedural requirements with which prisoners must comply in satisfying § 1997e(a)'s exhaustion requirement," the procedures set out in a prison's administrative grievance program serve as the measure for whether an inmate has exhausted his administrative remedies.  Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004).  This is not to say, however, that courts must blindly apply the written administrative exhaustion procedure without considering the reality of the review process. A procedurally faulty attempt at exhaustion, if accepted by the jail, will satisfy the PLRA.  Williams v. Beard, 482 F.3d 637, 640 (3d Cir. 2007) ("[T]o excuse a procedural default, a prison must only 'identif[y] the unidentified persons and acknowledg[e] that they were fairly within the compass of the prisoner's grievance.'") (quoting Spruill, 372 F.3d at 234); Camp v.

12

Brennan, 219 F.3d 279 (3d Cir. 2000) (prison authorities waived the exhaustion requirement when the ultimate administrative authority fully examined the inmate's complaint on the merits, even if the complaint did not comply with the prison grievance process).  Moreover, "Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant."  Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

In the present case, there is no dispute that Plaintiff's lawsuit is subject to the PLRA exhaustion requirements.  Instead, the parties argue about whether Plaintiff has exhausted his remedies.  Plaintiff has offered evidence from which a jury could find that there were two accepted methods of bringing requests to the attention of GGJF staff.  When the requests involved simple demands for information or material from staff, the inmate request forms were used.  When the requests involved objections to the conduct of jail personnel, GGJF officials accepted handwritten grievances and would respond to those grievances promptly.

Courts have recognized that an inmate may satisfy the exhaustion requirement where he follows an accepted grievance procedure, even where that procedure contradicts a written policy.  Baez v. Fauver, 351 F. App'x 679, 682 (3d Cir. 2009); Curtis v. Timberlake, 436 F.3d 709, 712 (7th Cir. 2005).  As the Seventh Circuit explained when considering a similar question:

13

What the defendants really contend, then, is that, no matter what the facts may show as to accepted practice, an inmate will have failed to exhaust as a matter of law any time prison officials decide to assert noncompliance with a written grievance procedure that effectively has been modified with staff acquiescence or participation.  In the view of the defendants, moreover, it makes no difference whether prison officials encourage, or even invite, noncompliance with written procedure.  [Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002),] does not support this result. That case holds that the rules governing administrative exhaustion under § 1997e(a) "come from the prison grievance systems themselves," Strong v. David, 297 F.3d 646, 649 (7th Cir. 2002), but we did not define the "administrative rules" that a prisoner must follow, see Pozo, 286 F.3d at 1025, as those reduced to writing whether or not followed in practice. Other courts have specifically rejected arguments similar to the one presented by the defendants. See, e.g., Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002) (holding that when prison officials told prisoner that grievance procedures were different than official procedures, prisoner was not required to follow written procedures); see also Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005) (stating that information provided to prisoner concerning operation of grievance procedures was relevant in deciding whether available remedies had been exhausted).

Curtis, 436 F.3d at 712.  Thus the Third Circuit, in an non-precedential opinion, recently reversed entry of summary judgment in favor of defendants on the issue of administrative exhaustion, where the inmate plaintiff offered evidence that he made use of a "parallel procedure" for expressing grievances that was adopted by the prison but that differed from the written regulations for prison complaints.  Baez, 351 F. App'x at 682.  The appeals court concluded that there remained a genuine dispute as to whether,

"practically speaking," the inmate had exhausted his administrative remedies by using this parallel procedure.  Id. Similarly here, where Plaintiff has provided evidence of a parallel procedure for addressing grievances, there is a genuine dispute as to whether Plaintiff exhausted his administrative remedies by pursuing this procedure.

Plaintiff has also offered evidence to suggest that he followed the parallel grievance procedure for the issues that ultimately formed the foundation of the present lawsuit.  In his March 22, 2007 letter to Defendant Merline, Plaintiff set forth both his deliberate indifference claims regarding his medical treatment (". . . I've been placed in extremely unsafe areas due to my medical condition;" ". . . my doctor sent several scripts with me from dialysis one was received weeks ago yet I still haven't seen any of the scripts filled . . .") and retaliation (suggesting that GGJF staff "purposefully" misinterpreted his letter in order to transfer him to high security, where he received inadequate medical care).  Though there is no evidence that Plaintiff submitted a grievance regarding the allegedly retaliatory housing transfers, the Inmate Handbooks makes clear that "Housing assignments and classification status" are not "grievable issues;" in short, there was no grievance method "available" for this element of his claim.  See Camp, 219 F.3d at 281 ("It will be recalled that (understandably enough) under

15

Section 1997e(a) the prisoner need only exhaust such administrative remedies 'as are available.'").

Finally, Plaintiff has presented evidence from which a jury could find that he provided GGFJ officials with adequate time and opportunity to address his complaints and that his complaints were rejected, so that he sufficiently exhausted his remedies before bringing suit.  Plaintiff did not file suit until April 9, 2007,[3] eighteen days after he submitted his March 22, 2009 grievance.  Plaintiff asserts that by waiting eighteen days, he gave Defendant Merline the requisite fifteen days in which to respond before filing his complaint as permitted under the Inmate Handbook procedure.  The Inmate Handbook states that the Director has "fifteen (15) working days from the date of receipt of the complaint to render his decision."  (Gorman Decl. Exh. A at II-1 to II-2.)  The Court is not in the position to determine what are "working days" at the GGFJ, as none of the parties have addressed this question.  Moreover, Plaintiff has presented evidence to show that the Inmate Handbook procedure was not the only recognized grievance procedure at GGFJ, so that the fifteen day window as described in the written policy may not apply to the

---

[3] The Court notes that Plaintiff signed his initial complaint on March 24, 2007, but Defendants have not suggested how the date of signature might relate to the date on which the action was "brought" under the PLRA.  Attached to the complaint is a Resident Account Summary dated March 28, 2007, suggesting that the complaint could not have been mailed earlier than March 28th.

unwritten grievance procedure of which Plaintiff availed himself. The record shows that GGFJ staff generally responded to Plaintiff's handwritten grievances within one to two days. According to Plaintiff, unlike all of Plaintiff's other grievances, Defendant Merline never responded to the March 22nd letter.  From this a jury could conclude that Defendant Merline rejected Plaintiff's grievance or failed to respond within the required period so that Plaintiff was not required to wait longer before bringing suit.  See Woulard v. Food Serv., 294 F. Supp. 2d 596, 602 (D. Del. 2003) ("[A] § 1983 prisoner complaint should not be dismissed for failure to exhaust administrative remedies when the record indicates that the plaintiff filed a grievance that has been completely ignored by prison authorities beyond the time allowed for responding to grievances under the grievance procedure."); see also Baez v. Fauver, 351 F. App'x 679, 682 n.3 (3d Cir. 2009) ("A prison must timely respond to inmate grievances . . ."); Boyd v. Corr. Corp. of Am., 380 F.3d 989, 996-97 (6th Cir. 2004) ("[W]e conclude that administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance."); Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004) (concluding that the affirmative defense of exhaustion is subject to estoppel if prison officials preclude the inmate from exhausting administrative remedies); Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[W]e

17

agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable . . . ."); Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002) ("We join the Eighth and Fifth circuits on  this issue because we refuse to interpret the PLRA so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances."); Foulk v. Charrier, 262 F.3d 687, 698 (8th Cir. 2001) ("[O]nce [the prison] failed to respond to [the prisoner's written grievance], no further administrative proceedings were 'available' to him.").

In sum, there remain several material questions in genuine dispute: (1) Whether a parallel procedure for addressing grievances exists and is recognized at GGFJ; (2) Whether Plaintiff adequately raised the issues presented in this litigation through such a grievance procedure; and (3) Whether Plaintiff exhausted that remedy and provided GGFJ officials adequate time to respond to the relevant grievances.  The Court therefore finds that Defendants are not entitled to summary judgment on the question of administrative exhaustion.

## C.   CFG Liability

Defendant CFG also moves for summary judgment on the ground that Plaintiff has not submitted any evidence from which a reasonable factfinder could find CFG liable under the doctrine of

18

municipal liability.[4]  In response Plaintiff reiterates his factual allegations against the individual CFG employees (Defendants Connors and Neal) and argues that there was a pattern of constitutional violations sufficient to establish municipal liability.  The Court finds, and will explain further below, that Plaintiff has not presented sufficient evidence to raise a genuine dispute regarding municipal liability and will grant summary judgment in favor of Defendant CFG.

It is well-established that municipal liability under § 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978)).  As a consequence, a municipality is liable under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694; Pembaur v. City of Cincinnati, 475 U.S. 469, 483

---

[4] In the heading for this portion of their motion for summary judgment, Defendant CFG state that they are seeking summary judgment on the grounds that CFG is not a "person" within the meaning of § 1983.  The substance of their argument, however, turns on municipal liability.  A municipality is a "person" subject to § 1983 liability, but that liability cannot be based on a theory of respondeat superior.  Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 416 (1997).  There is no dispute that CFG is a state actor performing the functions of a municipality.

(1986) (plurality opinion) ("[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.")

The Third Circuit has neatly defined "policy" and "custom" for the purposes of municipal liability.

> A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir.1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 [] (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." [Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)].

Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003).  Both must be tied to the responsible municipality.

> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983.  The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing

> practice so likely to result in the violation of
> constitutional rights, that the policymaker can
> reasonably be said to have been deliberately
> indifferent to the need.

Id. (internal punctuation and citations omitted).  Whether a
policy or a custom, "The plaintiff must also demonstrate that,
through its deliberate conduct, the municipality was the 'moving
force' behind the injury alleged."  Bd. of the County Comm'rs,
520 U.S. at 404.

Plaintiff does not dispute that a private corporation
performing a municipal function cannot be held vicariously liable
under § 1983.  See Natale, 318 F.3d at 583-84 (applying Monell to
liability of private health services company).  Instead,
Plaintiff argues that there is sufficient evidence to show that
CFG falls within the third Natale category -- deliberate
indifference to an inadequate policy or custom.  In support of
this argument, Plaintiff points to evidence that (1) Nurse
Connors retaliated against Plaintiff by making accusations
against his sister, (2) CFG employees (according to Plaintiff, it
was Nurse Connors again) retaliated against Plaintiff by falsely
claiming to feel threatened by his letter so that Plaintiff was
sent to high security where he received inadequate medical care,
(3) CFG employees left Plaintiff in high security even after he
was cleared,[5] (4) Dr. Neal refused to send Plaintiff to a

---

[5] Plaintiff has not offered any evidence to show who was
responsible for removing Plaintiff from high security or whether

dermatologist because he deemed it "elective" and "cosmetic," and (5) CFG personnel[6] repeatedly transferred Plaintiff from various housing units after he returned from high security.  Assuming this conduct was unconstitutional, the Court finds that no reasonable jury could find based on this evidence that CFG failed to respond to an obviously inadequate practice likely to result in the violation of constitutional rights.

Plaintiff has not offered evidence of a constitutionally inadequate policy or custom for which Defendant CFG may be held liable.  In fact, Plaintiff has not offered any evidence regarding the polices or customs of CFG.  Instead, Plaintiff seems to suggest that because Defendants Connors and Neal (perhaps along with other CFG staff members) were able to allegedly repeat unconstitutional conduct there must be some inadequate unconstitutional policy or custom.  It cannot be the case that in all circumstances where employees repeatedly violate the Constitution the employer may be found liable.  A rogue employee may succeed in evading even the most efficient policies and customs designed to avoid constitutional injury.  Without any evidence of wrongdoing by the municipality, independent from the wrongdoing of its employees, a Plaintiff cannot show that the

---

CFG staff had authority to make such a transfer.

[6] As addressed in note 1, <u>supra</u>, Plaintiff blames these moves on GGFJ personnel, not CFG staff.  (Pl. Dep. at 55-57, Def. CFG Exh. A.)

municipality was "the 'moving force' behind the injury alleged."
Bd. of the County Comm'rs, 520 U.S. at 404.

The cases cited by Plaintiff only support this conclusion.
In Natale the plaintiffs offered testimony regarding the
deficient policy of the prison healthcare provider for screening
inmates and the seventy-two hour gap in screening of new inmates,
so that there was no means of addressing the immediate medical
needs of prisoners.  318 F.3d at 585.  In Thomas v. Corr. Med.
Servs., Inc., No. 04-3358, 2009 U.S. Dist. LEXIS 21762, at *31-32
(D.N.J. Mar. 17, 2009), the plaintiffs provided testimony
regarding the absence of, and the need for, a policy regarding
the treatment of hepatitis.  In Todaro v. Ward, 565 F.2d 48 (2d
Cir. 1977), there was evidence identifying three specific
practices that were constitutionally infirm.  In Edwards v. Corr.
Med. Servs., No. 09-3979, 2010 U.S. Dist. LEXIS 37587, at *5-7
(D.N.J. Mar. 8, 2010), the district court declined to dismiss
where the plaintiff alleged "that CMS had a policy of 'preventing
prisoners from receiving timely diagnosis and treatment of their
medical conditions by refusing to refer them to qualified
specialists in order to save money.'"  In all of the above cases,
Plaintiff provided evidence (or allegations, which are
insufficient in this motion for summary judgment) of a
constitutionally inadequate policy.

In the present case, Plaintiff has not offered any evidence

23

identifying a faulty policy that, if corrected, would have prevented the alleged misconduct of CFG staff.  The only specific policy that Plaintiff purports to attack is based on Defendant Neal's refusal to send Plaintiff to a dermatologist because he labeled the visit "elective" or "cosmetic."  Contrary to Plaintiff's suggestion, however, Defendant Neal's conduct does not suggest that CFG had a policy of denying needed treatment from specialists in order to save money -- instead, it merely shows that Neal identified the visit as unnecessary.  Moreover, Plaintiff has not offered any evidence that any CFG policymaker[7] either knew or should have known about this alleged misconduct and failed to respond.  There is no evidence that CFG supervisors were notified of the alleged retaliatory conduct or the deprivation of required medical care, or that this conduct was so obvious that CFG should have known.  As such, Plaintiff has failed to offer evidence from which a reasonable jury could find that CFG was deliberately indifferent to an obviously unconstitutional policy or custom.  The Court will grant summary judgment in favor of CFG on this ground.

**D.   Serious Medical Need**

Plaintiff has filed a largely unopposed motion for partial summary judgment, asking that the Court find that he suffers from

---

[7] A municipality may only be held liable for the conduct of its final policymakers.  <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990).

several serious medical conditions.  Specifically, Plaintiff asks
that the Court find that his end-stage renal failure, his
congestive heart failure, and his calciphylaxis are serious
medical needs for which he had the right to adequate treatment
under the Fourteenth and Eighth Amendments.[8]  The Prison
Defendants do not oppose this motion, while the CFG Defendants
oppose only on the ground that there is no evidence that
Plaintiff suffered from calciphylaxis during the period relevant
to this litigation.  The Court will grant partial summary
judgment in favor of Plaintiff and find that he suffered from
serious medical conditions in the form of end-stage renal failure
and congestive heart failure, but deny partial summary judgment
on the question of calciphylaxis because there is a genuine
dispute as to whether Plaintiff suffered from this condition.

"'Serious medical needs' include: (1) those requiring
treatment following diagnosis by a physician; (2) those
conditions for which a lay person would recognize the necessity
of treatment; and (3) those conditions which, if untreated, would

---

[8] Though Plaintiff was a pretrial detainee at the time of
the relevant incidents, Plaintiff asks the Court to apply the
Eighth Amendment standard for deprivation of adequate medical
care.  The Third Circuit has not yet determined whether the Due
Process Clause of the Fourteenth Amendment provides pretrial
detainees with more protections regarding their medical care than
the Eighth Amendment, Tsakonas v. Cicchi, 308 F. App'x 628, 631
n.1 (3d Cir. 2009) (citing Natale, 318 F.3d at 581 n.5), and the
Court will not resolve this question where it has not been
raised.

result in lifelong handicap or permanent loss." <u>Salaam v.</u>
<u>Merlin</u>, No. 08-1248, 2009 U.S. Dist. LEXIS 64463, at *17 (D.N.J.
July 22, 2009) (citing <u>Monmouth County Corr. Institutional</u>
<u>Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987)).  There is
no genuine dispute that Plaintiff suffered from end-stage renal
failure and congestive heart failure and that both conditions are
serious, in that they require regular treatment and reduce the
life span of those afflicted.  (Iannuzzelli Report at 1, 2, Korn
Decl. Exh. G; Neal Dep. at 34-39, 39-40, Korn Decl. Exh. I.)
There is, however, genuine dispute as to whether Plaintiff
suffered from calciphylaxis, because there is no evidence in the
record that Plaintiff has been diagnosed with this condition.
Therefore the Court will grant partial summary judgment in favor
of Plaintiff and find that he suffered from the serious medical
conditions end-stage renal failure and congestive heart failure,
but deny partial summary judgment on the issue of calciphylaxis.

## III. CONCLUSION

For the foregoing reasons, the Court will deny Defendants'
motions for summary judgment on the question of administrative
exhaustion, but grant summary judgment in favor of Defendant CFG,
having found that Plaintiff has not offered evidence from which a
reasonable jury could find CFG liable under the doctrine of
municipal liability.  The Court will grant partial summary
judgment in favor of Plaintiff and finds that there is no genuine

dispute that he suffered from the serious medical conditions end-stage renal failure and congestive heart failure, but deny partial summary judgment on the issue of calciphylaxis.  The accompanying Order shall be entered.


**June 15, 2010**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           United States District Judge