IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STANLEY B. SMITH, JR., | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 07-1641 (JBS/JS) |
| v. | : | |
| GARY MERLINE, et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Bruce M. Gorman, Jr., Esq.
Jonathan M. Korn, Esq.
BLANK ROME, LLP
301 Carnegie Center
3rd Floor
Princeton, NJ 08540
        Counsel for Plaintiff Stanley B. Smith, Jr.

James T. Dugan, Esq.
ATLANTIC COUNTY DEPARTMENT OF LAW
1333 Atlantic Avenue
8th Floor
Atlantic City, NJ 08401
        Counsel for Defendants Gary Merline, Geraldine Cohen,
        Michael Kelly and Diana Bader

Debra Tatum Kuser, Esq.
DECKER & MAGAW
507 Westfield Avenue
Westfield, NJ 07090
        Counsel for Defendants Dr. James Neal and Jerry Connors

**SIMANDLE**, District Judge:

        This matter is before the Court on two motions for summary

judgment regarding a Complaint arising out of Plaintiff Stanley

B. Smith, Jr.'s treatment while a pretrial detainee at the

Atlantic County Justice Facility ("ACJF") in Mays Landing, New Jersey.  Defendants Dr. James Neal and Nurse Jerry Connors[1] (collectively, "Medical Defendants") seek summary judgment against Plaintiff's claims of deliberate indifference to a serious medical condition as well as his claims of first amendment retaliation.  [Docket Item 90.]  Defendants Gary Merline, the Division Director of ACJF, Captain Geraldine Cohen, Sergeant Michael Kelly, and Diana Bader (collectively, "Prison Defendants")[2], seek summary judgment against Plaintiff's retaliation claim, and on the grounds of qualified immunity and a lack of personal involvement beyond <u>respondeat</u> <u>superior</u>.  [Docket Item 91.]  For the reasons expressed below, the Court will grant both motions for summary judgment and dismiss the action.

## I.   FACTS AND PROCEDURAL HISTORY

The Court has previously recounted the basic facts about this case in its June 15, 2010 Opinion.  <u>See</u> <u>Smith v. Merline</u>, 719 F. Supp. 2d 438 (D.N.J. 2010).  The Court will here recount

---

[1] The party identified as "Nurse Jerry Connors" in the Amended Complaint is named Geraldine Ann Marin (Connors Dep. at 5:4-8), apparently having changed her last name since the initiation of this suit.  For consistency with the briefs and prior Opinions in this action, the Court will refer to her as "Connors" or "Nurse Connors" in this Opinion.

[2] The titles of some of the Prison Defendants have changed since the initiation of the suit.  For consistency, the Court will use the titles the parties had at the time Plaintiff initially filed his Complaint.

in greater detail those facts relevant to the present motions
that are supported in the record and are not disputed through
admissible evidence by the parties.  Where facts are disputed,
the Court will identify the dispute and determine whether it
involves a genuine dispute of material fact defeating summary
judgment.

**A.  Smith's Medical Conditions and Treatment**

Plaintiff was incarcerated as a pre-trial detainee at ACJF
from August 4, 2006 until he was sentenced approximately one year
later in August of 2007 and transferred to South Woods State
Prison.  (Classification Status/Disciplinary History Sheet, Dugan
Cert. Ex. J.)  Throughout his time at ACJF, Plaintiff suffered
from end-stage renal failure and congestive heart failure, both
serious medical conditions that required frequent medical
treatment.  (Iannuzzelli Rept. at 1, 2, Medical Defs.' Mot., Ex.
F; Neal Dep. at 34-39, 39-40, Ex. E.)

Throughout all times relevant to the case, Plaintiff
required regular hemodialysis ("dialysis") treatments to manage
his end-stage renal failure.  (Iannuzzelli Rept. at 1.)  Dialysis
treatments, such as Plaintiff experiences, require that a
patient's blood be "run through a machine . . . to remove excess
fluid from the body, remove waste products from the blood, and
balance the blood in terms of potassium, calcium, sodium, and
acid levels."  (Iannuzzelli Rept. at 1.)  While incarcerated at

ACJF, Plaintiff was treated by a nephrologist[3] and received three dialysis treatments each week lasting approximately four hours per treatment at an outside facility called AtlantiCare.  (Smith Dep. at 30:7-15, Medical Defs.' Mot., Ex. A.)

Plaintiff's dialysis treatments required that a "dialysis access" be surgically inserted into Plaintiff's arm beneath the skin to permit easier access to a blood vessel.  (Iannuzzelli Rept. at 2.)  This "intravenous access area" is described by the parties in this action variously as a "shunt" (Connors Dep. at 33:11-13, Medical Defs.' Mot., Ex. B), a "stint" (Smith Dep. at 27:20-21), and a "port" (Smith Dep. at 111:12-14).

As a side effect of his dialysis treatment, Plaintiff occasionally experienced sudden drops in blood pressure, dehydration, dizziness, temporary loss of vision, and headaches.  (Iannuzzelli Rept. at 2; Smith Dep. at 69:17-24.)  Additionally, Plaintiff on at least one occasion experienced unexpected bleeding from his dialysis port after departing from the dialysis center; such unexpected bleeding, if not "handled appropriately in a timely fashion . . . could lead to exsanguination and death within a few minutes."  (Iannuzzelli Rept. at 2.)  Defendant Nurse Connors expressed doubt, however, that Plaintiff's dialysis port could unexpectedly begin to bleed.  (Connors Dep. at 34:5-

---

[3] A nephrologist is a medical doctor with a specialization "in the area of kidney diseases."  (Neal Dep. at 7:20.)

7.)

While at ACJF, Plaintiff developed lesions in the form of
calcium crystal deposits on and under his skin.  (Neal Dep. at
48:22-49:1.)  These lesions may have been caused by
calciphylaxis, "a long-term end-stage irreversible complication
of renal disease."  (Neal Dep. at 53:6-7.)  If untreated,
calciphylaxis could develop into a serious medical condition with
potentially severe health effects.  (Iannuzzelli Rept. at 2; Neal
Dep. at 54:20-55:12.)  Plaintiff's lesions were treated, at least
in part, with "topical creams and ointments."  (Iannuzzelli Rept.
at 2.)

**B.  Smith's Complaints about Medical Staff**

Prior to March of 2007, Plaintiff was housed in the Medical
Housing Unit ("MHU") of ACJF, in part because of the dialysis
port in his arm, which left him vulnerable to assault by other
inmates, and in part because of his medical conditions.  (Connors
Dep. at 33:3-8; Merline Dep. at 18:4-7.)  Less than one half of
one percent of the total population of the ACJF were housed in
the MHU, and inmates are only housed in the MHU upon request of a
medical staff member.  (Cohen Dep. at 54:7-14, 55:1-2, Dugan
Cert. Ex. L.)  He served as the "dorm representative" (Cohen Dep.
at 30:2-20, Medical Defs.' Mot. Ex. J) or "tier representative"
(Smith Dep. at 48), meaning he was charged with forwarding
complaints from other inmates in the MHU to jail staff.  (Cohen

5

Dep. 30:21-31:4.)

In February and early March of 2007, Plaintiff wrote letters to Defendant (then) Director Merline and Defendant (then) Captain Cohen, complaining about the medical staff.  After receiving one such letter, Defendant Merline contacted (non-party) Captain James Murphy, requesting that he address the subject of the complaints with the medical staff, which Cpt. Murphy reported he did by requesting a medical supervisor to instruct the medical staff on the facility's policies.  (Murphy Dep. at 21:12-25, Dugan Cert., Ex. M; Murphy e-mail, Medical Defs.' Mot., Ex. I.)

On March 1, 2007, Defendant Nurse Connors approached Defendant Cohen to report that Plaintiff's sister, Officer Gail Smith, who worked as a corrections officer in the ACJF, frequently visited Plaintiff at his cell, during which times, Defendant Connors reported, Officer Smith would "bring[] him things" which she later clarified as being only "miscellaneous paperwork."  (Mar. 1, 2007 Cohen Rept., Gorman Decl. Ex. F.; Mar. 15, 2007 Connors Supplemental Rept., Gorman Decl. Ex. G.)  These visits were characterized as prohibited "fraternization."  Defendant Connors reportedly said that these visits "made him [Plaintiff] even more arrogant and belligerent," which Defendant Cohen believed was the primary reason Defendant Connors reported the fraternization.  (Id.)  Nurse Connors testified that she reported the fraternization in furtherance of her responsibility

6

to report rule infractions.  (Connors Dep. at 57:23-58:2.)

In the ACJF, prohibited fraternization, or informal contact
between inmates and prison staff, includes unreported contact
between relatives.  (Cohen Dep. at 76:12-19.)  Because such
contact between a corrections officer and an inmate constituted
an administrative violation at the ACJF, Director Merline
directed Internal Affairs at the facility to investigate the
allegations.  (Merline Dep. at 38:7-11.)

On March 2, 2007, Plaintiff wrote two letters to Defendant
Cohen complaining about the medical staff.  (Gorman Decl. Ex. C.)
One letter complained that medical staff were disciplining
inmates from elsewhere in the facility who socialized with
inmates housed in the MHU by expelling such inmates without
providing medical care, which Plaintiff described as "a crime
that needs to be addressed."  (Id.)  The second letter, dated the
same day, complained of other disciplinary actions taken by the
medical staff against inmates in the MHU.  The letter included
the sentence

> I wouldn't be surprised if a physical
> altercation take [sic] place, only for the
> member staff to do what it does best and
> change the facts and make it look as if they
> were assaulted . . .

Id. (ellipses original.)  The letter concluded with the sentence
"Please address these issues before something terrible takes
place."  (Id.)

The record is not entirely clear on who saw this letter and when. Nurse Connors testified that she might have seen the letter, but could not remember for certain. (Connors Dep. at 44:6-7.) She did remember, however, reading a "threatening letter that [she] wasn't sure what to do with" (Id. at 44:16-17) that she believed she had picked up in the MHU.[4] (Id. at 45:25-46:10.) She showed the letter to her supervisor, (non-party) Health Services Administrator Sandra Bernavon, explaining that she "didn't feel comfortable with the letter." (Id. at 44:22-45:10.) Connors did not know where the letter went after she gave it to her supervisor. (Id. at 48:10.) She never spoke about the letter again to anyone at the ACJF. (Id. at 48:20-23.)

On March 8, 2007, Plaintiff wrote a letter to Internal Affairs, complaining that not every inmate in the MHU was being seen by the medical staff as often as he believed they should, and requesting an investigation into the matter. Specifically, he complained that MHU inmates "vitals" were not being taken every day, and inmates were only being seen by doctors when they fill out a medical request form, rather than as a matter of course. (Mar. 8, 2007 Letter, Medical Defs.' Mot., Ex. H.) Specifically, Plaintiff wrote that "it's my right, to receive

_____

[4] Connors says she picked it up "with the sick calls" (Connors Dep. at 45:13), also known as medical request forms, which were slips submitted by inmates requesting a medical appointment in the clinic or medical attention in a cell. (Connors Dep. at 16:15-22.)

8

this medical attention and it just isn't happening . . ." (Id.)

### C. Smith's Transfer to High Security

Defendant Cohen received the second March 2, 2007 letter some days later and forwarded it to Cpt. Murphy to review because it dealt with complaints about the medical staff. (Cohen Dep. at 25:2, 27:8-15.) Defendant Cohen testified that she did not read the letter before sending it to Cpt. Murphy. (Id. at 27:3-12.) Cpt. Murphy, reviewed the letter on March 14, 2007; he interpreted its contents as threatening and "became concerned with the safety of the medical staff." (Mar. 14, 2007 Murphy Rept., Dugan Cert., Ex. D.) He "interpreted [the] statements as a warning that [Plaintiff] was planning to assault a member of the medical staff." (Id.) Cpt. Murphy contacted HSA Sandra Bernavon in the medical unit and shared the letter with her. (Id.; Murphy Dep. at 27:20-23.) She also interpreted the statements in the letter as threatening and "expressed concern for the medical staff as a whole." (Id.; Mar. 14, 2007 Bernavon Memo, Dugan Cert. Ex. E.) Consequently, Cpt. Murphy "filed a disciplinary charge [against Plaintiff] for making threats . . ." (Murphy Dep. at 26:22-23.) Cpt. Murphy then charged Plaintiff with violation code *.005 for threatening to assault a staff member. (Mar. 14, 2007 Cohen Rept., Dugan Cert. Ex. G.)

Cpt. Murphy then inquired of HSA Bernavon whether Plaintiff could be medically cleared for a transfer to a high security

cell.  (Mar. 14, 2007 Murphy Rept.)  Murphy felt that, while
Plaintiff was awaiting a disciplinary hearing on the threat
charge, he should be housed in a high security cell, explaining
that "[a]ny inmate who is charged with a serious offense in the
facility is transferred to high security."  (Murphy Dep. at
29:14-16.)  HSA Bernavon approved the transfer to a high security
cell in "Intake Left,"[5] provided that he be put on a regular
watch and housed in a cell alone.  (Mar. 14, 2007 Murphy Rept.)
Specifically, Bernavon reported to Cpt. Murphy in writing that

> Upon review of the current medical record, the
> inmate warrants a medical watch if he is moved
> from the observation room in medical.  The
> patient is currently under the care of
> nephrologists and receives dialysis three
> times a week.  Regardless of the stated
> threat, the healthcare department will
> continue to provide services without bias.
> The healthcare staff will be made aware of the
> inmates [sic] High Security Status.

(Mar. 14, 2007 Bernavon Memo.)

Defendant Cohen was then the captain in charge of
classifications, which is the department in ACJF that manages
inmate cell transfers.  (Cohen Dep. at 9:9-21.)  Cpt. Murphy
communicated that Plaintiff would need to be transferred from the
MHU to a cell in a high security unit, and conveyed the medical
restrictions HSA Bernavon had placed on such a transfer.  (Mar.
14, 2007 Murphy Rept.)  Defendant Cohen indicated that such

---

[5] Intake Left was also called "I-pod left" and "I-Left"
elsewhere in the record.

conditions could be met in I-Left Cell #7, and sent out an inter-office memo emphasizing the importance of maintaining the 30-minute watch and that Plaintiff be housed alone.  (Mar. 14, 2007 Cohen Memo, Dugan Cert. Ex. H.)  Cohen's memo also emphasized that in Cell #7, Plaintiff could be "directly observed by the Officer assigned to I-Pod."  (Id.; Merline Dep. at 83:16-21.)

Plaintiff was outside the facility as the officers prepared to transfer his cell assignment.  (Mar. 14, 2007 DiGerolamo Rept., Dugan Cert. Ex. C.)  In preparation for the transfer, Plaintiff's cell was searched and his property was transferred from the Medical Unit to I-Left #7.  (Mar. 14, 2007 Cohen Rept.) Sergeant Charles DiGerolamo conducted the search of Plaintiff's cell and discovered several prescription pills for his renal disease still in the plastic medical serving cups and two glass vials of a perfumed oil, both considered to be contraband.  (Id.; Mar. 14, 2007 DiGerolamo Rept.)  Consequently, Plaintiff was subsequently charged with violations *.205 (misuse of authorized medication) and *.210 (possession of anything not authorized for retention).  (Mar. 14, 2007 DiGerolamo Rept.)

At about 1:20 in the afternoon, Plaintiff returned to the facility and was informed of the charges that he was facing and was led to his new cell in I-Left.  (Id.)

**D.  Smith's Stay in High Security**

Plaintiff was held in I-Left #7 for approximately twenty one

11

days before being transferred back to the Medical Unit. (Smith Cell Transfer Sheet, Gorman Decl. Ex. U.) While he was there, he continued to be sent to his dialysis treatments three times a week, nurses continued to visit him regularly to dispense his prescription medications, and he continued to be treated for side effects of his conditions such as headaches and dizziness. (Smith Dep. at 93:6-94:24.) For example, at approximately 1:00 a.m. on March 15, Plaintiff complained to a guard of a severe headache and requested evaluation from the medical staff. Two guards and a nurse responded and the nurse measured Plaintiff's vital signs before providing him with Tylenol and clearing him to return to his cell. (Mar. 15, 2007 Langdon Rept., attached to Smith Dep., Medical Defs.' Mot., Ex. A.) Defendant Connors testified that ACJF nurses conduct rounds through the high security sections of the facility every day, dispensing medications and collecting sick call slips. (Connors Dep. at 17:22-18:5.) Nurse Connors testified that she, personally, delivered Plaintiff's medication to him at times while he was held in I-Left #7. (Connors Dep. at 49:23-25.)

However, on at least one occasion, Plaintiff reported requesting medical assistance due to low blood pressure and dizziness and was not seen by a medical professional for an undetermined period of time that he reported was more than four minutes. (Mar. 22, 2007 Smith Letter at 2, Gorman Ex. J.) When

12

he did eventually receive medical attention, he was treated by being given additional water to drink but was not sent to the hospital as he would have preferred and as he had been on other occasions.  (Smith Dep. at 67:10-17.)

Plaintiff's cell in I-Left was located "right next door" to the medical unit, only about forty feet, or two minutes away from the medical clinic.  (Merline Dep. at 22:23-23:5; Murphy Dep. at 19:10-14.)  Despite this close proximity, Plaintiff experienced pronounced anxiety that he would "pop a port," meaning that he would begin to bleed profusely from the dialysis access in his arm and perish from blood loss before he would receive medical attention.  (Smith Dep. at 111:21-24; Mar. 22, 2007 Smith Letter.)

On March 22, 2007, Plaintiff was found not guilty at his administrative hearing of making threats, but was found guilty of the contraband charges.  (Smith Classification Status Disciplinary History Sheet, Dugan Ex. J.)  He was sentenced to a loss of privileges of five days for each of the contraband violations.  (Apr. 5, 2007 Smith Disciplinary Appeal Rept., Dugan Cert. Ex. C.)  Plaintiff addressed a letter to Defendant Merline on that same date, expressing his concerns and fears about bleeding to death from popping a port and doubts that, were that to occur, medical professionals would be alerted in time because he could not be heard over the din of other prisoners in the

unit. (Mar. 22, 2007 Smith Letter.)  Defendant Merline testified that, in part because there were 1,200 inmates in the ACJF, he had no specific memory of receiving this or any other particular letter from Plaintiff.  (Merline Dep. at 24:21-25:5.)

Despite being found not guilty of the threats charge on March 22, 2007, Plaintiff was not returned to the MHU until April 4, 2007.  (Smith Cell Transfer Sheet, Gorman Cert. Ex. U.) Defendant Cohen testified that this was because the Classifications department only reviewed the disciplinary status of inmates being held in high security every thirty days.  (Cohen Dep. at 57:18-24; Mar. 14, 2007 Notice of Assignment at 2, Dugan Cert. Ex. I.)  She speculated, without specifically remembering, that in Plaintiff's case, they might have been able to review his status earlier than the review deadline of April 14 because "maybe it was a little slow and we got a chance to do some of our reviews early because we try to do them when we can."  (Id. at 57:25-58:2.)  She also testified that she was not notified by the hearing officer of the outcome of Plaintiff's March 22, 2007 disciplinary hearing until April 5, 2007, after she had already reviewed his status and transferred him back to the MHU.  (Cohen Dep. at 58:12-59:7.)

**E.  Smith's Request to See a Dermatologist**

During Plaintiff's incarceration at ACJF, he developed lesions resulting from calcium deposits in and on his skin.

14

These symptoms can be an indication that a renal patient such as Plaintiff is developing calciphylaxis, a "serious medical condition which may be associated with end stage renal disease" in which calcium deposits collect "in small vasculature, ultimately leading to obstruction of the vessel" and "ulceration of superficial tissue." (Iannuzzelli Rept. at 2.) Beginning on Mar. 12, 2007 until April 9, 2007, one of the nephrologists at Plaintiff's dialysis center wrote three different prescriptions suggesting that Plaintiff be referred to a dermatologist to be evaluated for possible calciphylaxis, or to "rule out calciphylaxis." (Smith Referral Slips, Gorman Cer. Ex. M.) Plaintiff complained that this had not happened yet in his March 22, 2007 letter to Defendant Merline, and again in a letter addressed to Internal Affairs on April 1, 2007. (Apr. 1, 2007 Smith Letter, Gorman Decl. Ex. K.) Plaintiff's expert reports that Plaintiff's skin lesions had been treated, at least in part, though topical creams and ointments. (Iannuzzelli Rept. at 2; See also Mar. 19, 2007 Smith Referral Slip (prescribing Cortizone to apply to Plaintiff's hands).)

On April 11, 2007, one of Plaintiff's doctors submitted a dermatology consultation request, which was received the following day by Defendant Dr. James Neal, a consultant medical director for ACJF's medical provider. (Neal Dep. at 5:8-21, 57:7-25; Neal Consultation Response Form, Gorman Decl. Ex. O.)

15

Dr. Neal testified that, after receiving the consultation request, he spoke with a nephrologist at Plaintiff's dialysis center to learn more about Plaintiff's condition and what was being sought by the dermatology consultation.  (Neal Dep. at 62:2-63:17.)

Dr. Neal learned, in that conversation, that Plaintiff was experiencing deposits of crystals in and on his skin related to his end-stage renal disease.  (Id. at 62:10-21.)  He said that while he may not have defined Plaintiff's condition in his notes as calciphylaxis, he assumed that was the cause of Plaintiff's symptoms, and planned what he believed to be an appropriate treatment regimen based on that assumption.  (Id. at 62:13-65:21.)  Dr. Neal also learned that the reason Plaintiff had requested a consultation with a dermatologist was not to determine whether or not he had calciphylaxis, but to have the visible crystal deposits surgically removed from Plaintiff's skin.  (Id. at 66:14-24.)  The nephrologist Dr. Neal spoke with informed him that such surgical removal of the deposits could potentially cause more harm than good because the wound sites might not heal well, and Plaintiff would be exposed to greater risk of infection, but it was desired by Plaintiff for cosmetic reasons.  (Id. at 67:11-16.)  The nephrologist informed Dr. Neal that the crystal deposits, which Dr. Neal was assuming to be calciphylaxis, would usually be treated through Plaintiff's

16

dialysis.  (Id. at 62:14-15.)

Plaintiff's medical expert, Dr. Andrea Iannuzzelli, upon reviewing Dr. Neal's notes and deposition transcript, but not having personally examined Plaintiff herself, interpreted Dr. Neal's notes to mean that his denial of the dermatology consultation was based on his considering the condition itself to be merely elective or cosmetic.  (Iannuzzelli Rept. at 3.)  She agreed, however, that Plaintiff's condition would be "best handled with medications and dialysis . . ."  (Id.)

Defendants' medical expert, Dr. Richard A. Sherman, upon reviewing Dr. Neal's notes and deposition transcript, but not having personally examined Plaintiff himself, opined that Plaintiff's condition likely was not calciphylaxis at all, but was, instead, likely a less serious "tumoral calcinosis." (Sherman Rept., Medical Defs.' Mot. Summary J. Ex. G.)  However, Dr. Sherman also agrees, assuming the condition was calciphylaxis, that surgical intervention to treat it would have involved risks that exceeded any benefit of such intervention. (Id.)

After Dr. Neal's conversation with the nephrologist, he met with Plaintiff about the dermatology request and explained his conclusion that surgical removal was not advisable to him.  (Neal Dep. at 61:5-3, 63:18-20.)  Then, Defendant Neal called the dialysis center back and spoke with a nurse named Daphne to

17

notify them of his decision to deny the consultation request as
elective and cosmetic. (Id. at 63:19-24.) Finally, he recorded
his decision in a progress note, in which he names the nurse he
spoke with after his decision, but does not name the nephrologist
he spoke with or that he spoke with a nephrologist at all. (Apr.
17, 2007 Neal Notes, Gorman Cert. Ex. O.) He also completed a
consultation response form indicating his decision to deny the
dermatology request, in which he notes that he "discussed with
dialysis center" and again characterizes the request as "cosmetic
or elective intervention." (Neal Consultation Response Form.)

**F.  Smith's Return to the Medical Housing Unit**

On April 4, 2007, Plaintiff was returned to the MHU and
placed in a cell on the right-hand side of the unit. (Smith Cell
Transfer Sheet.) The MHU was at that time divided into two
wings, a right side and a left side. (Merline Dep. at 52:18-23.)
The right side of the unit had eight cells, and the left side of
the unit had two cells. (Connors Dep. at 27:18-19.) Medical
Left was used for several purposes, including to quarantine ill
inmates or to house female inmates separately from the male
inmates who needed to be housed in the MHU. (Merline Dep. at
52:22-23.) The record is silent about what other differences
there were between the two sides of the unit, except that
Defendant Connors testified that "it's the same kind of cells
that is in the right side" as in the left side. (Connors Dep. at

27:16-17.)

Approximately two weeks after being returned to the MHU, Plaintiff was moved from Medical Right to Medical Left, on April 20, 2007.  He was moved back to Medical Right approximately 39 days later, on May 29.  Approximately 24 days later, Plaintiff was again moved to Medical Left on June 22, and was moved back to Medical Right again one week later on June 29.  (Smith Cell Transfer Sheet.)  Plaintiff complained about the transfers and was told that it was due to a "stint in [his] neck" (Smith Dep. at 57:2-5.)  However, he found that explanation unsatisfying because he "didn't have a stint in [his] neck."  (Smith Dep. at 57:5.)  He also overheard two ACJF officers discussing his movements within the MHU, which included Defendant Diana Bader, who worked in the classifications department.  (Smith Dep. at 60:9-14; Cohen Dep. at 13:5-8.)  When Defendant Bader was asked why Plaintiff was being moved from one side of the MHU to the other, Bader responded that "it's an ongoing thing."  (Smith Dep. at 61:5-8.)

Defendant Cohen testified that Plaintiff's two transfers to Medical Left and back were made because of health reasons. (Cohen Dep. at 63:12-15.)  Specifically, Defendant Cohen recalled that Plaintiff, who was on a low sodium diet because of his renal disease, was receiving unapproved foods from other inmates in Medical Right, so he was moved to Medical Left to prevent this

19

from happening, and to more closely monitor that he was taking

his medication.  (Cohen Dep. at 63:17-23, 64:19-21.)  Defendant

Cohen could not recall specifically whether these reasons applied

to both of Plaintiff's transfers to Medical Left, or only to one.

(Cohen Dep. at 65:18-23.)

Plaintiff alleged that the transfers were retaliatory in

nature, done for no reason other than to disrupt him as

punishment for speaking out.  He points out that, after he

amended his Complaint in this action on July 2, 2007, adding the

retaliation claim against the classifications Defendants Cohen,

Kelly, Bader, and Lisa Johnson,[6] his transfers between the

different sides of the MHU ceased.

Plaintiff was ultimately transferred out of the ACJF to

South Woods State Prison in Bridgeton, New Jersey, on August 14,

2007, approximately 46 days after his final transfer within the

MHU.  (Smith Classification Status/Disciplinary History Sheet,

Dugan Cert. Ex. J.)

### G.  Procedural History

Plaintiff filed his first <u>pro se</u> Complaint in this matter

while he was still housed in I-Left on March 24, 2007, which was

received by the Court on April 9, 2007.  [Docket Item 1.]  On

---

[6] Defendant Lisa Johnson was terminated from this action
when Plaintiff filed his most recently amended Complaint on
October 29, 2008, which omitted her as a Defendant.  (<u>See</u> Am.
Compl., Docket Item 49.)

April 26, 2007, Plaintiff filed a separate action against
Defendants Dr. James Neal and Defendant Connors, which was
docketed in this action as an amended complaint on May 16, 2007.
[Docket Item 6.]   On June 22, 2007, Plaintiff filed an amended
pro se Complaint adding retaliation claims and additional
defendants, which was docketed on July 2, 2007.  [Docket Item
10.]   On July 2, 2008, the Court appointed pro bono counsel, who
drafted the currently operative Amended Complaint on October 29,
2008. [Docket Item 49.]   The operative Amended Complaint seeks
relief under three counts: Count I, deliberate indifference to a
serious medical conditions; Count II, § 1983 retaliation; and
Count III, medical negligence.  On August 17, 2009, Plaintiff
voluntarily dismissed the negligence claim of Count III.  [Docket
Item 65.]   The Parties first moved for summary judgment in
February and March of 2010, which the Court granted in part and
denied in part on June 15, 2010.  Smith v. Merline, 719 F. Supp.
2d 438 (D.N.J. 2010).  Thereafter, Defendants again moved for
summary judgment.  [Docket Items 90 & 91.]   Plaintiff filed
opposition [Docket Items 93 & 94], and Defendants filed reply
briefs.  [Docket Items 95 & 96.]


II.  **DISCUSSION**

  A.   **Standard of Review**

  Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 323.

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.")  Local Civil Rule 56.1 requires that a party seeking summary judgment file a statement of material facts not in dispute in separately numbered paragraphs citing to the supporting evidence.  L. Civ. R. 56.1(a).  The motion filed by the Prison Defendants [Docket Item 91] included only a "statement of material facts" that was not in technical compliance with the rule because it lacked separately numbered paragraphs.  Plaintiff urges the Court to deny the motion on this basis, but the Court declines the invitation, observing that Defendants' technical deficiency does not appear to have been in bad faith and the statement of facts included in their brief is in substantial compliance with the rule.  See Jones v. Miner, Civ. No. 06-1606, 2007 WL 2212508, at * 2 n.5 (D.N.J. July 27, 2007) (finding that "because the Court finds no evidence of bad faith, and finds Defendant's factual representations to be well-organized, the Court will not deny Defendant's motion on these procedural grounds").

**B.   Deliberate Indifference to Serious Medical Condition**

Plaintiff's remaining two claims against the Defendants are (1) a claim that the Defendants were deliberately indifferent to Plaintiff's serious medical conditions, and (2) a claim that Defendants retaliated against Plaintiff's protected First Amendment activity.  With regard to Plaintiff's claim of deliberate indifference, Plaintiff alleges that Defendants exhibited deliberate indifference to his medical conditions by transferring Plaintiff from the MHU to I-Left #7, where he was not given the same level of treatment.  Plaintiff also alleges that Defendants exhibited deliberate indifference by denying his request for a dermatology consultation to rule out calciphylaxis. The Court concludes that, upon a review of the undisputed facts in the record, summary judgment is appropriate for Plaintiff's deliberate indifference claims.

1.   Deliberate indifference standard under Fourteenth Amendment

The parties appear to dispute the appropriate constitutional standard in this case.  Plaintiff argues that, because he was a pre-trial detainee rather than a convicted prisoner at the time of the alleged violations, the Eighth Amendment standard cited by the Medical Defendants does not apply.  Instead, Plaintiff argues, he is entitled to greater protections under the Fourteenth Amendment when determining whether his medical care was constitutionally adequate.  However, the Fourteenth Amendment

24

standard Plaintiff cites as the appropriate one does not appear
to meaningfully differ from the Eighth Amendment standard cited
by the Medical Defendants.

The Court agrees with Plaintiff that the Eighth Amendment's
protection against cruel and unusual punishment is not directly
applicable to one, such as Plaintiff, who has not been convicted
and is therefore not subject to "punishment" at all.  Hubbard v.
Taylor, 399 F.3d 150, 164 (3d Cir. 2005) ("The Eighth Amendment's
Cruel and Unusual Punishments Clause does not apply until 'after
sentence and conviction.'") (citing Graham v. Connor, 490 U.S.
386, 392 n.6 (1989)).

Instead, under the Due Process Clause of the Fourteenth
Amendment, government officials are required to provide medical
care to inmates being detained prior to conviction, because to
not do so would amount to punishment in the absence of a proper
determination of guilt.  King v. County of Glouchester, 302 F.
App'x 92, 96 (3d Cir. 2008).

Whether the minimum standard for inmate medical care under
the Fourteenth Amendment is higher than the Eighth Amendment has
never been conclusively determined by the United States Supreme
Court or the Third Circuit.  City of Revere v. Massachusetts
General Hosp., 463 U.S. 239, 244 (1983); King, 302 F. App'x at 96
("the Supreme Court has concluded that the Fourteenth Amendment
affords pretrial detainees protections 'at least as great as the

25

Eighth Amendment protections available to a convicted prisoner,'
without deciding whether the Fourteenth Amendment provides
greater protections.") (citing <u>Natale v. Camden County Corr.
Facility</u>, 318 F.3d 575, 581 (3d Cir. 2003)).

     While Plaintiff argues that he is entitled to greater
protections under the Fourteenth Amendment than the Eighth
Amendment, he cites the general deliberate indifference standard
applied by courts in both Eighth Amendment cases as well as
Fourteenth Amendment cases.  Plaintiff argues that "the test is
not whether the Medical Defendants acted with deliberate
indifference, but rather whether they committed acts and
omissions <u>that</u> <u>indicate</u> deliberate indifference to a serious
medical need."  (Pls.' Opp. to Medical Defs.' Mot. Summary J. at
5) (emphasis original).  The Court finds no meaningful
distinction between these standards.  <u>See</u> <u>Pearson v. Prison
Health Serv.</u>, 348 F. App'x 722, 724 (3d Cir. 2009) ("In order to
state an Eighth Amendment claim for deliberate indifference to
medical needs, a plaintiff must plead '(i) a serious medical need,
and (ii) acts or omissions by prison officials that indicate
deliberate indifference to that need.") (quoting <u>Natale</u> at 582
(applying standard in Fourteenth Amendment case, but citing to
Eighth Amendment cases)).  Thus, while the Court recognizes that
courts have not foreclosed the possibility that the Fourteenth
Amendment offers greater protections than the Eighth Amendment in

26

this area, the Court will not invent a higher standard where the Plaintiff does not ask for one.  The Court will, therefore, apply the Eighth Amendment standard cited by Plaintiff.

To survive summary judgment, Plaintiff must point to evidence in the record raising a dispute of fact over whether (1) Plaintiff suffered from a serious medical need, and (2) whether Defendants committed acts or omissions that indicate deliberate indifference to that need.  That Plaintiff suffered from the serious medical conditions of renal failure and congestive heart failure is not disputed on this record.  Additionally, there is sufficient evidence in the record to at least raise a dispute of fact over whether he suffered from the serious condition of Calciphylaxis.  (Iannuzzelli Rept. at 2; Neal Dep. at 65:18-21.) See Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (finding medical needs may be deemed serious if the denial or delay potentially would result in serious injury, long term harm, or permanent disability).  The question, thus, is whether evidence raises an issue over whether any of the Defendants in this action exhibited deliberate indifference to those needs.

Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law."  Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000).  Thus, errors equivalent to negligence or medical

malpractice, or mere disagreements about the proper course of treatment do not meet this standard.  Lanzaro, 834 F.2d at 346. The Third Circuit has found acts or omissions that indicate deliberate indifference in cases where

> the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.

Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

The Court will apply this standard to both of the aspects of Plaintiff's medical care that he alleges constituted deliberate indifference, beginning with his transfer to I-Left #7.

2. Transfer to high security

Plaintiff alleges that Defendants exhibited deliberate indifference to his end-stage renal disease by housing him in a cell in I-Left rather than keeping him in the MHU.  The Court concludes that Plaintiff does not point to any evidence sufficient to raise a dispute of fact on this issue.

a)  Defendants' personal involvement

As an initial matter, the Court must grant summary judgment over the deliberate indifference claim regarding Plaintiff's transfer to I-Left because Plaintiff does not allege sufficient personal involvement of any appropriate defendant in this action. The undisputed facts in the record demonstrate that the decision

28

to transfer Plaintiff to I-Left was made by Cpt. Murphy (not a party to this suit), HSA Bernavon (not a party to this suit), and Defendant Cohen.[7]  Plaintiff also alleges that Defendant Merline is liable for deliberate indifference to Plaintiff's medical care based on Merline's position as warden of the facility.  (Smith Dep. at 52:3-8.)  Plaintiff points to no evidence raising an issue over whether Defendants Connors or Neal refused to provide medical care to Plaintiff while he was housed in I-Left.  (See, e.g. Connors Dep. at 49:23-25 (testifying that she delivered medications to Plaintiff while he was in I-Left).)

Thus, the only two Defendants about whom Plaintiff alleges specific facts regarding his medical treatment while in I-Left are the non-medical Defendants Cohen and Merline.  The Third Circuit has held that

> absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official [like Defendants] will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  Thus, Plaintiff must show more than that Defendants Merline and Cohen knew and/or were involved in Plaintiff's transfer to I-Left, but that they were aware or had reason to believe his medical care

---

[7] The Court notes that Plaintiff appeared to expressly waive the deliberate indifference claim as to Defendant Cohen in his deposition.  (Smith Dep. at 52:13-16; 53:20-24.)

while there was insufficient or non-existent.

As to Defendant Cohen, Plaintiff points only to Cohen's awareness that Plaintiff had specialized medical needs, and that, because the MHU had such a small percentage of the total prison population, he might have been seen by a medical professional more frequently at the MHU.  However, the undisputed facts show that Defendant Cohen was told that Plaintiff was medically cleared for the transfer so long as his cell assignment met HSA Bernavon's conditions.  This is insufficient to show deliberate indifference under Spruill.

As to Defendant Merline, there is undisputed testimony that Defendant Merline was not involved in the decision to transfer Plaintiff to I-Left.  (Merline Dep. at 50:1-52:16.)  Plaintiff did, however, write a letter to Defendant Merline on March 22, 2007 complaining of his medical treatment on I-Left.  But there is no evidence indicating that Defendant Merline read the letter prior to Plaintiff's return to the MHU on April 4.  The Third Circuit has held that in order to show sufficient personal involvement to warrant liability under § 1983, a plaintiff must establish that the defendant had personal involvement in the alleged wrongs, which can be shown through (1) personal direction, or (2) actual knowledge and acquiescence.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988.)  Plaintiff's evidence fails to raise a dispute of fact that Defendant Merline

either personally directed Plaintiff's transfer to I-Left, or that he had actual knowledge of the treatment. Plaintiff's letter alone is insufficient to show more than constructive knowledge. See id. at 1208 (finding plaintiff's evidence of published newspaper articles and grievance letters filed with defendant's office insufficient to show actual knowledge and acquiescence.)

Consequently, Plaintiff has not met his burden to establish that any of the Defendants in this action were personally involved in his medical treatment in I-Left. The Court must, therefore, grant summary judgment against Plaintiff's deliberate indifference claim about that portion of his treatment.

> b)   Plaintiff's care was adequate under
>      deliberate indifference standard

Alternatively, even if the Court were to determine that Defendant Neal, Connors, Cohen, or Merline were sufficiently involved in the transfer and care Plaintiff received in I-Left, Plaintiff has not alleged sufficient mistreatment to meet the high standard necessary under Third Circuit precedent.

Plaintiff testified that while he was being housed in I-Left, he experienced a sudden drop in blood pressure, for which he was treated by being given water to drink rather than being sent to the emergency room and given a saline injection, as he had experienced on other occasions. (Smith Dep. at 67:10-17.) He also testified that consuming water was a treatment that his

doctors had approved for treating drops in blood pressure on other occasions.  (Smith Dep. at 68:17-19.)

Plaintiff also testified that he was afraid of unexpectedly bleeding from his access port and not being able to receive medical attention in the four minutes he believed it would take to bleed to death.  (Smith Dep. at 111:21-24.)  However, there is uncontested evidence that Plaintiff was within two minutes of the medical unit, and that every time he requested medical attention while stationed in I-Left, he received it.  Moreover, there is no evidence that such dangerous bleeding from the access port occurred while Smith was housed at I-Left.

Finally, there is uncontested evidence that while in I-Left, Plaintiff continued to receive his regular dialysis treatments, continued to receive his medications, and was able to see medical professionals when he requested it.  The Court concludes that, on the basis of this evidence, Plaintiff has not met his burden of demonstrating a dispute of fact that any official at the ACJF exhibited deliberate indifference to his medical needs with regard to his time on I-Left.  Plaintiff's preference for going to the emergency room and receiving intravenous saline rather than being given water to drink for his blood pressure is not indicative of deliberate indifference.  Christy v. Robinson, 216 F. Supp. 2d 398, 413 (D.N.J. 2002) ("misdiagnosis or preference for a certain type of treatment will not alone rise to the level

of deliberate indifference."). Plaintiff's subjective fear of bleeding from his access port does not establish deliberate indifference, as there is no evidence in the record from which a reasonable jury could conclude that, should Plaintiff have begun to bleed, officials at ACJF would have responded to his needs as quickly as possible; his doubts on that score amount to merely a disagreement with prison medical personnel over the kind of treatment and housing he needed. See Clark v. Doe, Civ. No. 99-5616, 2000 WL 1522855, at * 2 (E.D. Pa. Oct. 13, 2000) (finding no deliberate indifference where "inmate has received some level of medical care. Inmates' disagreements with prison medical personnel about the kind of treatment received have also generally have not been held to violate the Eighth Amendment.") (internal citations omitted). The Constitution, whether through the Eighth or Fourteenth Amendments, assures adequate medical care, not ideal medical care.

Consequently, the Court finds that Plaintiff has not provided sufficient evidence to survive summary judgment against his claim that his transfer to I-Left and treatment while there constituted deliberate indifference to a serious medical condition.

### 3. Denial of dermatology consultation

Plaintiff also alleges that Defendant Dr. James Neal exhibited deliberate indifference to a serious medical condition

by denying his request to visit a dermatologist.  Plaintiff has provided evidence that his outside nephrologist submitted three prescription blanks over a period of weeks indicating that Plaintiff should see a dermatologist to rule out calciphylaxis. Plaintiff also introduced evidence that Dr. Neal denied his consultation request, and recorded his decision as being based on a determination that "we do not provide elective or cosmetic interventions."  (Apr. 17, 2007 Neal Notes.)  Plaintiff also produced the expert report of Dr. Iannuzzelli, who reported that, in her expert opinion, denying a consultation with a dermatologist to determine whether or not Plaintiff had calciphylaxis as "elective or cosmetic" constituted deliberate indifference.  Finally, Plaintiff also points to Defendants' expert Dr. Sherman indicating skepticism over whether Plaintiff's symptoms were indicative of calciphylaxis as raising a material issue of fact over whether Plaintiff had calciphylaxis, and thus whether Dr. Neal's decision to deny him a consultation with a dermatologist was deliberately indifferent to a serious medical condition.

However, there is uncontested evidence in the record that Dr. Neal already assumed Plaintiff's symptoms were indicative of calciphylaxis, and that he and Plaintiff's nephrologists planned a treatment program based on Plaintiff's dialysis and medication. There is also uncontested evidence in the record that Plaintiff

sought the dermatologist consultation not to determine whether or not he had calciphylaxis, but for the surgical removal of some of his lesions, which Defendant Neal and Plaintiff's nephrologists agreed could potentially expose Plaintiff to greater medical risk.

Plaintiff's expert suggests, on the basis of the fact that Defendant Neal only recorded the name of the dialysis nurse with whom he spoke, and did not record the name of the nephrologist (or even that he spoke with a nephrologist) raises a material issue of fact over whether Dr. Neal's denial of the consultation was based on medical evidence. However, the Court finds that no reasonable factfinder could disregard Dr. Neal's testimony on the basis of his incomplete notes. This is not a credibility determination, but merely a finding that Dr. Neal's testimony that he spoke with a nephrologist is not contradicted in the record. The Court also finds that, even if a reasonable factfinder could conclude on the basis of this record that Defendant Neal spoke only with a dialysis nurse, his medical decision to treat what he assumed to be calciphylaxis through dialysis rather than through surgical intervention does not amount to deliberate indifference.

Consequently, the Court finds that Plaintiff has not met his burden of pointing to evidence that raises a dispute of fact that any of Plaintiff's medical treatment at ACJF amounted to

35

deliberate indifference in violation of the Fourteenth Amendment.[8]  The Court will grant Defendants' motions for summary judgment against Plaintiff's Fourteenth Amendment claims (Count I).

### C.  First Amendment Retaliation

Plaintiff's second claim is that Defendants retaliated against him for his criticism of the medical staff and filing complaints, in violation of the First Amendment.  Specifically, Plaintiff alleges that (1) Defendant Connors retaliated against him for his complaints about the medical staff by reporting his fraternization with his sister, (2) Defendants Merline, Cohen, Kelly, Bader and Connors retaliated against him by transferring him to I-Left, (3) Defendant Neal retaliated against him by denying his dermatology consultation, and (4) Defendants Merline, Cohen, Kelly, Bader and Connors retaliated against him by transferring him from Medical Right to Medical Left and back twice.

The Third Circuit has held that a plaintiff can maintain a claim for § 1983 retaliation if the evidence raises an issue

> (1) that the conduct leading to the alleged retaliation was constitutionally protected; (2) that he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional

---

[8] Because the Court will grant summary judgment on these grounds, it unnecessary to reach Defendants' argument that Plaintiff cannot prove damages through evidence of fear alone.

> rights; and (3) that his protected conduct was
> a substantial or motivating factor in the
> decision to discipline him.  However, 'prison
> officials may still prevail by proving that
> they would have made the same decision absent
> the protected conduct for reasons reasonably
> related to a legitimate penological interest.'

Alexander v. Fritch, 396 F. App'x 867, 871 (3d Cir. 2010) (citing

and quoting Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001)

(internal citations omitted)).  That Plaintiff's complaints about

the medical staff are constitutionally protected is not disputed.

The parties dispute the other three prongs of the claim, and

additionally, Defendants argue that Plaintiff has not alleged

sufficient personal involvement in the allegedly retaliatory acts

by many of the Defendants.

### 1.  Respondeat Superior

The Court will thus again address the personal involvement of

the Defendants.  Defendants argue that Plaintiff can point to no

evidence tending to show that Defendants Merline, Cohen, Kelly,

and Bader had personal involvement in the allegedly retaliatory

acts of which Plaintiff complains.

The Court will first consider Defendant Merline, about whom

Plaintiff points only to Plaintiff's March 22, 2007 letter as

evidence of his knowledge and acquiescence in the allegedly

retaliatory acts.  The Court stated above the standard for

personal involvement under Rode v. Dellarciprete, and concluded

that the existence of the letter alone is insufficient to raise a

dispute of fact of whether Defendant Merline had actual knowledge
and had acquiesced in any of his employees' conduct.  In addition,
in the case of retaliation, the only retaliatory act of which
Plaintiff's March 22 letter could have given Defendant notice
would have been his transfer to I-Left, which had already happened
by that time.  "Such after-the-fact notice does not amount to
actual knowledge and acquiescence in a past wrong."  Walsh v.
Corzine, Civ. No. 06-6075, 2010 WL 2516463 at * 2 (D.N.J. June 12,
2010).  Thus, the Court concludes that Plaintiff has not raised an
issue of fact over Defendant Merline's personal involvement in the
alleged retaliation.

As to Defendant Kelly, Plaintiff's sole evidence supporting
the personal involvement of Sgt. Kelly is the fact that he worked
in Classifications during the period covered by Plaintiff's
Complaint, and that cell transfers could not happen without
Classifications knowing about it.  The Court finds this to be
insufficient.  The testimony of Defendant Cohen that
"Classifications" would have known about all cell transfers does
not establish that every single member of Classifications knew
about every single cell transfer in the facility.  Thus, without
more evidence that Defendant Kelly at least knew about the cell
transfers himself, the Court finds no dispute of fact regarding
his personal involvement.

As to Defendant Bader, Plaintiff testified about a

conversation he overheard between Bader and another officer, in which Bader said that Plaintiff's transfers within the MHU were "an ongoing thing."  This statement would raise a dispute of fact over whether Defendant Bader knew about any allegedly retaliatory transfers occurring, but does not raise an issue that she personally participated in them.  Additionally, unlike Defendants Cohen or Merline, Defendant Bader was not in a position of authority over the conduct of her co-defendants.  The Third Circuit has held that

> where actual supervisory authority is lacking, mere inaction, in most circumstances, does not reasonably give rise to a similar inference [of acquiescence].  As a general matter, a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have 'acquiesced' in the latter's conduct.

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997) (abrogated on other grounds by Burlington Northern & Sante Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  Thus, merely providing evidence that Defendant Bader knew of Plaintiff's transfers, without any evidence raising an issue of fact over her particular involvement is insufficient; the Court finds no dispute of fact regarding Defendant Bader's personal involvement in acts of retaliation against Plaintiff.

As to the other Defendants, Dr. Neal, Nurse Connors and Geraldine Cohen, the Court agrees with Plaintiff that sufficient evidence of personal involvement exists.  The Court thus next

turns to whether Plaintiff has can raise a dispute of fact regarding whether any of the alleged retaliatory acts meet the Third Circuit standard.

2.  <u>Report of fraternization</u>

Plaintiff alleges that Nurse Connors reported Plaintiff's sister's visits as fraternization in retaliation for his complaints about the medical staff in February of 2007.  Plaintiff points to evidence in the record that Defendant Connors was motivated by a desire to make Plaintiff less arrogant and belligerent.  Defendant Connors denied being motivated by a desire to affect Plaintiff's attitude by reporting the fraternization, but merely by a sense of duty to report infractions where she observed them.  Plaintiff argues that this dispute over Defendant Connors' motivation is sufficient to raise a dispute of fact over whether the act was retaliatory in nature.

The Court disagrees.  First, the Court finds no evidence in the record to raise a dispute of fact over the second prong: whether the act was an "adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  <u>Alexander v. Fritch</u>, 396 F. App'x at 871.  Plaintiff has offered no evidence of harm he suffered as a result of Defendant Connors' act.  Thus, the act fails to rise to the level of § 1983 retaliation.

Additionally, the Court finds that, even assuming Plaintiff

raised evidence that the act was sufficiently adverse, the Court finds no dispute of fact over whether fraternization would be reported for "reasons reasonably related to a legitimate penological interest" <u>Id.</u>  Defendant Cohen and Defendant Merline both testified that fraternization between staff and inmates who are family members is a violation of the facility's regulations. Defendant Merline additionally testified that such contact can raise serious dangers to staff and inmates.  (Merline Dep. at 40:18-41:12.)  Thus, even if Plaintiff were able to establish that the act was adverse and motivated by Plaintiff's protected conduct, the Court would still grant Defendants summary judgment against the claim because it is reasonably related to a legitimate penological interest.

> 3.  <u>Plaintiff's transfer to high security</u>

Plaintiff additionally alleges that his transfer to I-Left was retaliatory.  He alleges that his March 2, 2007 letter to Defendant Cohen was intentionally and unreasonably interpreted as threatening when it was, in fact, merely a complaint about the medical staff.  In support of his claim, Plaintiff points to evidence in the record raising a question of fact as to whether Defendant Connors saw the letter immediately after Plaintiff wrote it, apparently raising the inference that she influenced the letter's interpretation by Cpt. Murphy and HSA Bernavon. Plaintiff also points to evidence in the record that the letter

was eventually determined not to be threatening at Plaintiff's March 22, 2007 disciplinary hearing.  Finally, Plaintiff points to the fact that he continued to be held in I-Left for two more weeks after being found not guilty of the threats, claiming to raise an inference that the reason he was transferred and held in high security was unrelated to his allegedly threatening letter.

Defendants argue that transferring Plaintiff to a different unit in the facility does not constitute an adverse act because prisoners have no constitutional right to be assigned to any particular cell.

The Court finds that this Plaintiff's transfer to I-Left does not raise a dispute of material fact indicating that Plaintiff's transfer was retaliatory.  The Court disagrees with Defendants that the transfer to a different, high-security unit cannot be an adverse act merely because Plaintiff had no particular liberty interest in being assigned to a particular area of the prison. See Allah v. Seiverling, 229 F.3d 220, 223-24 (3d Cir. 2000) (concluding that transfer to segregated confinement could constitute adverse act, even in the absence of a protected liberty interest in a particular cell assignment).  However, the Court concludes, instead, that Plaintiff has failed to raise a dispute of fact indicating that the adverse act of the transfer was motivated by his protected conduct.  It is undisputed that Cpt. Murphy and HSA Bernavon made the determination that the letter was

42

threatening, and there is no evidence indicating that Cpt.
Murphy's decision to transfer Plaintiff to High Security was
influenced by any of the Defendants in this action.[9]  The fact that
Plaintiff was not returned to the MHU until April 4 was explained,
in uncontradicted testimony by Defendant Cohen, that his housing
status merely had not come up for review yet.  There is no
evidence that his status review was delayed because of retaliatory
animus.  Indeed, his review happened more than a week before it
was mandated by internal policy.

Additionally, the Court also finds that even if there were
evidence supporting the claim that the transfer was motivated by
his complaints, there is no dispute of fact that it was reasonably
related to a legitimate penological interest (protecting staff
from an inmate who made a potentially threatening statement).
Thus, the Court finds that there is no dispute of fact to support
Plaintiff's claim that the transfer was retaliatory, and the Court
will also grant summary judgment against this portion of the
claim.

4.   <u>Dr. Neal's denial of dermatology consultation</u>

Next, Plaintiff alleges that Dr. Neal denied his request to

---

[9] Even assuming that Defendant Connors did see the letter
first and presented it to HSA Bernavon with the explanation that
she did not "feel comfortable" with it would not raise a dispute
of fact over the motivation for the transfer because there is
uncontradicted testimony from Cpt. Murphy that he independently
determined the letter to be a threat before showing it to HSA
Bernavon.

be seen by a dermatologist in retaliation for Plaintiff's complaints about the medical staff.  Plaintiff points to Dr. Neal's April 17, 2007 notes, which indicate that he was aware of Plaintiff's disputes with the medical staff, and Dr. Neal's testimony that he was aware of Plaintiff's grievances with the staff as evidence that Dr. Neal was motivated by retaliatory animus.  However, Dr. Neal testified that his notes from April 17, 2007 were recording a hypothesis about Plaintiff's medical condition.  Specifically, Dr. Neal wrote "I advised staff of improper, inflammatory statements allegedly made by inmate regarding nurse(s) and questioned whether there was clinical basis for change in affect (Azotemia, Uremia)."  (Apr. 17, 2007 Neal Notes.)  Dr. Neal testified that he was asking the medical staff to inquire into whether Plaintiff's reported complaints and threats toward the medical staff might have been caused by one of Plaintiff's medical conditions.  (Neal Dep. 84:10-14.)

The Court concludes that this evidence does not raise a dispute of fact over whether Dr. Neal's decision to deny Plaintiff's dermatology consultation request was motivated by Plaintiff's protected conduct.  There is no evidence in the record from which a reasonable factfinder could conclude that Dr. Neal felt anything other than professional concern for Plaintiff's health.  Consequently, the Court will enter summary judgment against Plaintiff's claim of retaliation regarding his denial of a

44

dermatology visit.

     5.   <u>Plaintiff's transfers in MHU</u>

Finally, Plaintiff alleges that he was transferred from the right side of the MHU to the left side and back twice in retaliation for his complaints against the medical staff.  In support of this Claim, Plaintiff points to testimony that nurses such as Defendant Connors were capable of effecting transfers within the Medical Unit, and that when asked, Plaintiff was not given a satisfactory answer to why he was being transferred, from which a factfinder could conclude that there was none. Additionally, Plaintiff points to the fact that, once he amended his Complaint to name the Classifications defendants, the transfers ceased, as raising an inference that the transfers had been retaliatory.

The Court concludes that Plaintiff has not raised a material issue of fact on the issue of whether the transfers within the MHU constituted an adverse act.  There is no evidence in the record indicating that the transfers harmed or negatively interfered with Plaintiff's life in any way.  Defendant Connors testified that the cells on the left were the same kind of cells as those on the right.  There is no evidence of a material difference in available medical care between the left and right units.  The Court concludes that there is no evidence raising a dispute of fact that these transfers would have deterred a person of ordinary firmness

45

from exercising his constitutional rights.

Additionally, the Court concludes that there is insufficient evidence to raise a dispute of fact that the transfers were motivated by Plaintiff's protected conduct.  Defendant Cohen testified that at least one of Plaintiff's transfers was done for health reasons, to prevent other inmates from slipping him high-sodium food that would interfere with his renal disease treatment. There is no evidence from which a reasonable factfinder could conclude that either of the transfers were made for any other reason.  That fact that Plaintiff added the Classifications defendants immediately prior to the end of the transfers does not raise a permissible inference of causation, as there is no evidence that any of the Defendants were aware of being named in the action prior to Plaintiff's departing the facility. Consequently, the Court will grant summary judgment against Plaintiff's claim that his MHU transfers were done in retaliation for his complaints.

In sum, the Court determines that Plaintiff has failed to point to evidence raising a dispute of fact that any alleged action taken by Defendants in the facility rises to the level of § 1983 retaliation.  Consequently, the Court will grant Defendants summary judgment against Count II of the Complaint.[10]

---

[10]  Because the Court has concluded that summary judgment is warranted against Plaintiff's claim of retaliation, the Court does not reach Defendants' argument that they are entitled to

III.  **CONCLUSION**

The Court has reviewed the facts in the record and found no evidence from which a reasonable factfinder could conclude that his medical care was constitutionally infirm or that the Defendants retaliated against him for his constitutionally protected speech.  Consequently, the Court will grant Defendants' motions for summary judgment and dismiss the action.

The accompanying Order shall be entered.


**June 21, 2011**                          **_s/ Jerome B. Simandle_**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge

---

qualified immunity.